Filed 6/12/14  Fleischman v. Law Office of Paul Stanton CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DON U. FLEISCHMAN, | B216898 |
| Plaintiff, Cross-Defendant, and Appellant, | (Los Angeles County Super. Ct. No. BC254772) |
| v. | |
| LAW OFFICE OF PAUL STANTON, | |
| Defendant and Appellant; | |
| PAUL L. STANTON, | |
| Cross-Complainant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Paul L. Gutman, Judge.  Affirmed in part, reversed in part, and remanded.

Brown, Brown & Klass, Delos E. Brown, Robert L. Kaufman and John J. Stumreiter for Plaintiff, Cross-Defendant and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Bartley L. Becker and Allison A. Arabian for Defendant and Appellant.

Nemecek & Cole, Frank W. Nemecek and Mark Schaeffer; Law Offices of Warren Nemiroff and Warren N. Nemiroff for Cross-Complainant and Appellant.

———————————————

Attorney Paul Stanton and his law firm, the Law Offices of Paul Stanton, appeal from the trial court's judgment denying them relief in their complaint for breach of a fee agreement against their former client, Don Fleischman, and ordering them instead to return to Fleischman several hundred thousand dollars in legal fees. Former client Fleischman is satisfied with the trial court's judgment, but filed a protective cross-appeal in the event the judgment were reversed. We hold the trial court erred (1) in ordering attorney Stanton to disgorge all the fees he received from Fleischman and (2) in awarding Fleischman his attorneys' fees and costs. As for Fleischman's cross-appeal protectively alleging instructional error and error in the valuation date of real estate that Fleischman recovered while Stanton represented him, we affirm.

## FACTS AND PROCEEDINGS

1.   *Fleischman Family History and Events Leading to Don Fleischman's Hiring of Attorney Paul Stanton*

Joan and Art Fleischman, who married in 1952, were the parents of Don Fleischman and his brother, Dan Fleischman. (Because of the shared surname of the Fleischman family participants in these proceedings, we will identify them by their given names.) In addition to rearing Don and Dan, Joan and Art raised Joan's son, Ken Kaplan, from her first marriage to Ken's late father, who died decades ago. During Art and Joan's marriage, Art prospered in the janitorial supply business. Over the years, he and Joan acquired multiple pieces of commercial and residential real estate, consisting of: a warehouse on Third Street in downtown Los Angeles; a warehouse on Garey Street in downtown Los Angeles; a warehouse in Vernon; a home in La Cañada; and a condominium in Pasadena.

In the early 1990's, Dan took control of the personal and financial affairs of his mother Joan, whose cognitive abilities were declining. In 1997, Joan, who by this time was living apart from her husband, Art, drafted a will and created an inter vivos trust naming Dan trustee with a power of attorney and leaving the great bulk of her estate to him. The only property Joan did not give to Dan was $100 in cash to Don and her former

home in Hermosa Beach which she had acquired before marrying Art, which she bequeathed to Ken.

In light of evidence that Dan was physically and financially abusing Joan, Ken sought a conservatorship for Joan. In 1998, the probate court appointed two conservators (Sharon Woody and Sarah Kerley), who retained the law firm Loeb & Loeb to represent them as they moved to protect Joan's interests. Dan resisted the conservators' attempts to wrest control of his mother's affairs from him. Dan's resistance was hard-fought, involving multiple lawsuits including suits against Don and Ken. Among the lawsuits were *Dan Fleischman v. Kenneth Kaplan, Don Fleischman, Arthur Fleischman, et al.* (L.A.S.C. case No. BC214702); *Dan Fleischman, trustee of the Joan M. Fleischman Intervivos Trust v. Arthur Fleischman, the Arthur Fleischman Personal Trust, Kenneth Kaplan and Don Fleischman et al.* (L.A.S.C. case No. YC 037205); *In the Matter of the Joan M. Fleischman Revocable Intervivos Trust u/a/d 7/8/97* (L.A.S.C. case No. BP 060964); and *In the Matter of the Conservatorship of Joan Fleischman* (L.A.S.C. case No. BP 061285). But with the help of Loeb & Loeb, the conservators took control of Joan's affairs from Dan.

In conjunction with the conservators' efforts, conservator Sarah Kerley suggested to Don that an elder abuse lawsuit be filed against Dan. Consequently, Don and his father, Art, contacted attorney Paul Stanton, whose law firm website advertised that Stanton specialized in elder abuse law. After meeting Stanton, Don and Art retained him to represent them in their claims against Dan personally and as trustee of Joan's trust.[1] Stanton prepared a written retainer agreement. It stated in part:

"We [Stanton and his firm] agree to represent you in connection with your claims against Dan Fleischman, individually and as Trustee of the Joan Fleischman Trust.

---

[1] Don and Art did not retain Stanton to bring any claims against Dan regarding Art or Art's property. But Stanton claimed otherwise, testifying they retained him for a broader purpose: "They [Don and Art] retained me to assert whatever claims could be asserted against Dan."

(In this regard we are representing you as individuals only. In the event any of you are appointed the conservator of the Joan Fleischman Conservatorship Estate, and we become your attorneys in that capacity, the attorney's fees for such services are compensated as determined by the court for such services.)"

Although Don and Art retained Stanton at the conservators' suggestion, the conservators did not use Stanton's legal services. Indeed, before Don retained Stanton in March 2000, the conservators and their law firm, Loeb & Loeb, had successfully removed Joan from Dan's care and placed her in a convalescent home. They had also achieved revocation of Dan's power of attorney for Joan and his removal as trustee for her inter vivos trust.

Art died a few weeks after signing Stanton's retainer agreement. Art's will and trust disinherited Dan and, except for about $100,000 to Ken, left Art's estate to Don.

2.     *Stanton's Representation of Don*

When Don retained Stanton, Don believed Stanton would file an elder abuse claim against Dan to recover property Dan had taken from Joan. Stanton never filed an elder abuse lawsuit against Dan and did not tell Don that only Joan (or her conservators) could file such a suit. Indeed, Stanton conceded under cross-examination at trial that no such lawsuit was needed because Joan's conservators had ended Dan's abuse of Joan. However, while Stanton was representing Don, Stanton dissembled about his reason for not filing an elder abuse lawsuit by telling Don that the "wheels of justice" moved slowly.

In the conservatorship proceedings, Loeb & Loeb and the conservators proved Dan had misappropriated about $600,000 of Joan's money. Because of the misappropriation, which the probate court found was in bad faith, the probate court entered against Dan a judgment including statutory sanctions of about $1.2 million. The conservators also got a court order ejecting Dan from Joan's home in La Cañada.

The conservators' probate court victory forced Dan in September 2000 to agree to

4

mediate his dispute with Don over their parents' estates. As a result of the mediation, the conservators agreed not to enforce the $1.2 million judgment against Dan in return for his agreeing to the following: He voluntarily disinherited himself by renouncing his interest in Joan's and Art's estates and trusts. Additionally, he dismissed lawsuits he had filed against Joan's trust and Art's estate, including a $100 million creditor's claim he had filed against Art's estate. He disclaimed interest in Joan's $500,000 life insurance policy, the proceeds of which were to be split between Don and Ken. Finally, he vacated the warehouse on Third Street through which he had asserted, to Don's exclusion, control over Art's janitorial business.

A few months later in February 2001, Joan died. At Stanton's insistence, Don and Ken in February 2001 mediated their competing remaining interests in their mother's estate. Under Joan's estate plan, Ken was to receive all Joan's property if Dan predeceased her. In the wake of Dan's voluntary disinheritance in the September 2000 mediation, Ken sought to recover Joan's property for himself, almost as if Dan's disinheritance amounted to his predeceasing Joan. As a result of the February mediation, however, Ken agreed to let Don buy out Ken's share of their mother's estate for $1,250,000. In return for the services Stanton claimed that he rendered to Don against Dan, Stanton arranged for the February mediation settlement to contain a provision promising him a fee of $430,000 to be paid from Joan's or Art's estates. The February mediation agreement stated: "The parties agree that the sum of $430,000 shall be paid to Paul L. Stanton from Joan's Trust and/or Art's Trust as the contingent fee portion of the attorneys' fees for services rendered prior to the death of Joan M. Fleischman in connection with litigation with Dan Fleischman. This amount is inclusive of the fees payable to Paul L. Stanton from the Massachusetts Mutual Life Insurance Policy . . . ."

In April 2001, Stanton received a check payable to Don and Ken in the sum of $487,754.95 as Joan's life insurance proceeds from Massachusetts Mutual Life Insurance Company. Stanton endorsed the check purportedly on Don's behalf. He paid Ken about $200,000 from the proceeds, took $97,550.99 as his contingency fee, and deposited the rest – about $190,000 – into his client trust account which Don could not access.

5

Don thereafter dismissed Stanton and on May 3, 2001, sent a letter to Stanton disputing Stanton's right to any of the life insurance proceeds. Don demanded Stanton return to Don the funds Stanton withheld. Up to the time of Don's May 2001 letter, Don had never told Stanton that he was unhappy with Stanton's representation of him or the results of the September and February mediations. Also up to the time of the letter, Don had paid Stanton's bills charging Stanton's reduced hourly rate without complaint. But in his May 2001 letter, Don wrote: "I intend to retain counsel . . . to represent me in connection with our fee dispute. In the meantime, you are not authorized to distribute any of my mother's insurance proceeds in your trust account to yourself or to any other person. Demand is made that you restore to the trust account any funds which you have previously withdrawn. [¶] I also demand that you deposit all of said insurance proceeds into a separate interest bearing account in my name which I will open. I will provide you with the bank information for the account so that you can transfer the funds directly into said account." Despite Don's telling Stanton that Don disputed Stanton's right to pay himself his fees from Joan's insurance proceeds, Stanton conceded at trial that he nevertheless did exactly that: "Q. And you took the rest of it that would have been Don's share [of the insurance proceeds] and you kept it in your client trust account; correct? [¶] A. Yes. [¶] Q. And that's still there; isn't it? [¶] A. No. [¶] Q. Where is it now? [¶] A. In my pocket."

In June 2001, Stanton asked the probate court to enforce payment of his fees from Joan's trust. Arguing that he was entitled to $430,000 in fees under the February mediation settlement agreement, Stanton's probate court petition sought an order authorizing Stanton to pay himself the additional sum of $190,203.96 from Joan's life insurance proceeds in his trust account and an order instructing Joan's trust to pay him $142,245.05 as the remaining balance. The probate court dismissed Stanton's petition, a dismissal Division 4 of this court affirmed in 2004 in an unpublished opinion. (*Stanton v. Fleischman* (Apr. 14, 2004, B158265) [nonpub. opn.].)

In the meantime, in July 2001 Don filed a malpractice complaint against Stanton and his law firm. Don alleged causes of action for professional negligence, breach of

6

fiduciary duty, and declaratory relief. In his claim for declaratory relief, Don alleged that Stanton was demanding $430,000 in attorneys' fees from Don but Don believed that "any purported fee agreement" was invalid. According to the claim for declaratory relief, the parties thus needed a determination of their rights, duties, and obligations, and to "the extent that [Don] owes [Stanton] any money whatsoever as attorneys' fees, said fees would be reduced or eliminated by damages caused to" Don by Stanton's alleged negligence and breach of fiduciary duty.

Stanton filed a cross-complaint against Don based on Don's refusal to pay the additional legal fees that Stanton claimed Don owed him. He alleged breach of the retainer agreement. He also alleged breach of the $430,000 payment promised him under the February mediation agreement. He further alleged two causes of action for declaratory relief on the grounds actual controversies existed over the retainer agreement's validity and whether the February mediation agreement entitled him to a $430,000 payment. Finally, he alleged a cause of action for the reasonable value of the legal services he provided to Don.

The complaint and cross-complaint were tried to a jury. On October 31, 2008, both Don and Stanton rested their cases. After the close of evidence and before jury arguments began, Don filed a motion for judgment that the retainer agreement was unenforceable.[2] Don asserted the retainer agreement unlawfully restricted his right as a client to discharge Stanton. Don also asserted the retainer agreement unlawfully restricted his right as the client to settle his lawsuit on whatever terms he saw fit. Don thus requested that the court enter judgment on Don's third cause of action for declaratory relief or on his affirmative defense that the retainer agreement was void.

On the day the parties began their closing arguments and before the trial court submitted the case to the jury, the court found Stanton's retainer agreement with Don was void and granted Don's motion for judgment. The court concluded that the retainer agreement was void against public policy because it created an "undisclosed, unwaived,

---

[2]     Stanton calls Don's motion one for a "directed verdict."

and irreconcilable" conflict of interest between Stanton and Don, and the unlawful provisions could not be severed from the rest of the retainer agreement. At the hearing on the motion, the court stated "Any purported agreement to pay the sum sought by defendant [Stanton] is invalid."

After the court found the retainer agreement was void and closing arguments concluded, the jury began deliberating on November 14, 2008. The jury reached its special verdict on November 20, 2008. The jury found Stanton had not been professionally negligent, but had breached his fiduciary duties to Don. However, Stanton's breach of fiduciary duties did not cause Don legal damages.

The court entered judgment in April 2009. Judgment was for Don on his complaint's third cause of action for declaratory relief finding the retainer agreement void and, because the retainer agreement was void, against Stanton on his cross-complaint seeking to collect fees from Don. The court ordered Stanton to disgorge all the money that he had received or retained in representing Don in the amount of $400,775.00 and to return that money to Don with interest in the amount of $318,043.97. The court also awarded Don his reasonable attorneys' fees and costs incurred in the litigation between him and Stanton.

Stanton filed a notice of appeal. Don accepts the judgment in his favor as is, but filed a protective cross-appeal in the event we reverse it.

**DISCUSSION**

1. *Court's Judgment That Retainer Agreement is Void*

   a. <u>*Two Unlawful Restrictions on Don's Rights as a Client*</u>

      i. <u>Restricting Don's Right to Terminate Stanton</u>

Stanton's retainer agreement with Don was a hybrid hourly-and-contingency fee agreement. In return for Stanton's accepting a lower hourly rate than his normal rate, Don promised to pay Stanton 20 percent of any recovery from Dan. The agreement stated: "[Stanton] will be paid for the services rendered under this agreement a

8

contingent fee of twenty percent (20 [percent]) of any recovery whether it is in cash or in kind." The retainer agreement restricted Don's ability to terminate Stanton, however, by eliminating the discount in Stanton's hourly rate and restoring Stanton's normal hourly rate if Don discharged Stanton before Don's litigation against Dan ended. The retainer agreement stated:

> "In the event that prior to our substantial performance of the services contemplated by this agreement, our services terminate for any reason not covered above, then in lieu of the compensation provided above, and without regard to the outcome of this matter, you shall pay us for all services theretofore rendered at the hourly rates then charged by us, but in any event not less than the following hourly rates:  [¶] a. Paul L. Stanton $350  [¶]  b. Associate Counsel $250  [¶]  c. Paralegals $150  [¶] d. Secretarial/Clerical $50."

### ii.        Restricting Don's Right to Settle

Stanton's retainer agreement also restricted Don's ability to settle his claims against Dan. The agreement stated:

> "Remember, you are under no obligation whatsoever to ever make a settlement that is not in your best interests. If you choose not to settle and if the court or jury awards you nothing, our fees will be limited to the hourly rate fees you have agreed to pay as set forth above. [¶]  The only exception would be a bad faith termination of our services by you prior to a formal acceptance of a settlement package to which we had significantly contributed or a bad faith acceptance of a low settlement offer. For example, let us assume that we have spent four months negotiating the terms of a settlement which appears to be acceptable except for minor tuning and adjustment. If, at that time you were to discharge us in order to avoid payment of our contingent fee as contained in this agreement and either engaged new counsel or finished the settlement yourself with the help of non-lawyers, we would be entitled to the greater of (i) the amount payable pursuant to this agreement, based on the proceeds of any settlement or other disposition of the

9

matter, or (ii) compensation for services rendered at double the hourly rates then charged by us."

> b. *Court Finds Restrictions Invalidate Retainer Agreement*

The trial court found the foregoing two restrictions that Stanton imposed on Don's right to terminate Stanton and to settle his claims against Dan made the agreement unenforceable because the restrictions created a conflict of interest between Stanton and Don.[3] We agree that the provisions were unenforceable, but because Stanton did not try to enforce them, we find the court's disgorgement order, which we discuss further in Part 3, was error.

"It has long been recognized in this state that the client's power to discharge an attorney, with or without cause, is absolute." (*Fracasse v. Brent* (1972) 6 Cal.3d 784, 790; *Champion v. Superior Court* (1988) 201 Cal.App.3d 777, 783.) "The interest of the client in the successful prosecution or defense of the action is superior to that of the attorney, and he has the right to employ such attorney as will in his opinion best subserve his interest. The relation between them is such that the client is justified in seeking to dissolve that relation whenever he ceases to have absolute confidence in either the integrity or the judgment or the capacity of the attorney . . . . The fact that the attorney has rendered valuable services under his employment, or that the client is indebted to him

---

[3]     Don also argued the retainer agreement was void because it imposed a charging lien for Stanton's benefit on Stanton's 20 percent share of Don's recovery. According to Don, Stanton violated professional ethics by not getting Don's written consent to the adverse interest that the lien created between him and Stanton. (State Bar Rule 3-300.) However, the court declined to decide whether a charging lien on a contingency fee is unethical because it found the issue legally unsettled. (See *Fletcher v. Davis* (2004) 33 Cal.4th 61, 70, fn. 3 [Supreme Court declined to decide whether Rule 3-300 applies to lien against prospective recovery under contingency fee agreement]; *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38, 48 [noting *Fletcher* left application of Rule 3-300 to contingency fee agreements undecided].) The trial court instead rested its voidness ruling on the restrictions the retainer agreement imposed on Don's right to terminate Stanton and to settle his case.

10

therefor, or for moneys advanced in the prosecution or defense of the action, does not deprive the client of this right."[4] (*Fracasse,* at p. 790.)

A client also has the right to settle his case without his attorneys' consent. (See, e.g., *Lemmer v. Charney* (2011) 195 Cal.App.4th 99, 103-104.)

Although a client has the right to terminate his attorney and to settle his case, an attorney may recover under quantum meruit for the reasonable value of his services to the client. Thus, a client who discharges an attorney under a contingency-fee agreement hoping to keep the entire recovery to himself might nevertheless owe a fee to the attorney. (*Fracasse, supra,* 6 Cal.3d at p. 791; *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1382; *Rus, Miliband & Smith v. Conkle & Olesten* (2003) 113 Cal.App.4th 656, 671-672.) As the Supreme Court explained in *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, "Permitting quantum meruit recovery . . . recogniz[es] that attorneys may recover from their clients the reasonable value of their legal services when their fee contracts or compensation agreements are found to be invalid or unenforceable for other reasons." (*Id*. at pp. 461-462; see also *Calvert v. Stoner* (1948) 33 Cal.2d 97; *Selten v. Hyon* (2007) 152 Cal.App.4th 463, 471-472 ["When services are rendered under a contract that is unenforceable as against public policy, but the subject services are not themselves prohibited, quantum meruit may be allowed."].)

Here, however, despite the availability in principle of recovery under quantum meruit, Stanton painted himself into a corner by waiving quantum meruit and abandoning at trial his effort to collect the $430,000 fee he claimed under the February mediation agreement. Instead, he sought recovery of fees solely under the terms of the retainer agreement for which he sued for breach of contract, a trial stratagem he concedes in his appellate briefs. He writes, "A motif of [Don's] brief is that Mr. Stanton cannot recover any fee because he waived his right to a quantum meruit recovery. True. In reliance on

---

**4**      *General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1169 is distinguishable because the contract allegedly breached there was an employment contract for in-house counsel in his capacity as an employee, not for outside counsel acting as an independent professional.

the trial court's judicial estoppel ruling two years before trial, Mr. Stanton abandoned his quantum meruit, unjust enrichment, and declaratory relief causes of action, and proceeded to trial on the single cause of action in his cross-complaint for breach of contract." Stanton claims he abandoned quantum meruit in detrimental reliance on the court's purported ruling that estopped Don from challenging the retainer agreement's validity – a claim that, as we explain below in section 4, the record does not support. But whatever the reason for Stanton's decision to abandon quantum meruit, his recovery under a breach-of-contract theory collapsed when the trial court found that the contingency provision in the retainer agreement was void, leaving no other provision in the retainer agreement by which to calculate a *contractual* fee award. Absent a lawful contractual fee provision in the retainer agreement, Stanton's only recourse was to recover fees in quantum meruit – but his trial strategy prevented that recovery.

2. *Don's Motion on Enforceability of Retainer Agreement*

Before the case was submitted to the jury, Don moved for judgment on his claim that the retainer agreement was, as alleged in his complaint's cause of action for declaratory relief and in his 19th affirmative defense to Stanton's cross-complaint, unenforceable.[5] The court's order granting Don's motion recited the procedural history as follows: "[Don] brought on for hearing [his] Motion for judgment on [his] declaratory relief cause of action and/or [his] 19th affirmative defense to [Stanton's] cross-complaint. The parties fully briefed and argued the Motion by and through their attorneys of record. Thereafter, the Court granted the Motion on the ground that the Retainer Agreement upon which [Don's] Complaint and [Stanton's] Cross-Complaint were based was void against public policy due to undisclosed, unwaived, and irreconcilable conflicts of interest

---

[5] Don styled his motion as one for a directed verdict, but because he was asking the court to decide the validity of the retainer agreement without submitting the matter to the jury or the jury's involvement, "directed verdict" was somewhat of a misnomer.

created by the Retainer Agreement between the parties, which conflicts of interest were not severable from the Retainer Agreement."

Stanton contends Don's third cause of action for declaratory relief concerned only the February mediation agreement, not the retainer agreement. Thus, according to Stanton, the retainer agreement's validity was not properly before the court or jury. Stanton suggests Don's motion blindsided him, because even though Don's complaint had not requested a bench trial, that is exactly what the court gave Don. Stanton's respondent's brief states: "In the proceedings below, Mr. Fleischman said nothing about trying an equitable cause of action to the court until one month into the jury trial. Saying nothing, his attorney impaneled a jury to try his legal malpractice cause of action and his breach of fiduciary duty cause of action. Then, Mr. Fleischman asked the court to 'try' his declaratory relief cause of action after both sides had presented their evidence to the jury. . . . [¶] [Fleischman] asked the court to render judgment on the declaratory relief cause of action, sitting *without* the jury, as if a court trial had already occurred . . . ." (Original Italics.)

The record does not support Stanton. Don's complaint reasonably put Stanton on notice that Stanton's fees under the retainer agreement were at issue in the proceedings. Don's complaint alleged in a paragraph incorporated by all causes of action that "[Don] retained [Stanton] to represent him in connection with certain matters relative to the case of his mother . . . . In connection with such representation, there was purportedly a written retainer agreement between [Don] . . . on the one hand, and [Stanton], on the other hand, pursuant to which [Stanton and his law firm] now claim that they are entitled to both an hourly fee and contingency fee . . . ." Elsewhere in his complaint in another paragraph incorporated by all causes of action, Don alleged that the February mediation agreement was an additional agreement under which Stanton sought recovery of fees. That paragraph stated "In or about February 2001, a mediation was held between [Don] and Ken Kaplan to try to resolve disputes between them as to the allocation of the estate of Joan Fleischman. . . . An agreement was reached between [Don] and Ken Kaplan, which was memorialized in writing ('Mediation Agreement') . . . [Stanton] caused to be

13

inserted into the Mediation Agreement a provision for the payment of Defendants' purported contingency fee."

Stanton notes that in an allegation contained in Don's cause of action for declaratory relief, Don specifically noted a controversy existed over payment of $430,000 in fees. Don alleged, "[Stanton and his firm] contend that [Don] owes [Stanton] attorneys' fees in the amount of $430,000. [Don] is informed and believes any purported fee agreement to pay the sum sought by [Stanton and his firm] is invalid . . . ." Stanton's claim that this one allegation lulled him into thinking only the February mediation agreement was at issue is belied by Stanton's own cross-complaint. Stanton himself sought in his cross-complaint a declaratory judgment concerning the validity of the retainer agreement. He alleged in his cross-complaint, "An actual controversy now exists between STANTON on the one hand and [Don] on the other hand, with respect to the Fee Agreement. Stanton is informed and believes and thereon alleges that [Don] contend[s] that the Fee Agreement is void and unenforceable. Stanton disputes such contention and contends that the Fee Agreement is valid, enforceable and entitles Stanton to a contingency fee based upon the value of assets obtained by [Don] due to Stanton's efforts. Stanton hereby seeks a declaration of this court as to the respective rights and obligations of Stanton and [Don] under the Fee Agreement." Thus Stanton cannot reasonably claim he did not know the retainer agreement was at issue in the trial. Moreover, Stanton did not object to the court ruling on Don's motion on the validity of the retainer agreement, and therefore cannot now be heard to complain that he did not know the agreement was at issue. (Accord, *Taylor v. Union Pac. R. Corp.* (1976) 16 Cal.3d 893, 900 ["a party cannot without objection try his case before a court without a jury, lose it and then complain that it was not tried by jury"].)

Stanton also contends the court's ruling on Don's motion amounted to an improper bench trial within a jury trial. His contention is unavailing. Don's motion expressly asked the court to rule on his equitable cause of action for declaratory judgment. It is common for a claim for declaratory relief to be tried separately from legal claims, and the trial court has the discretion to decide the sequence in which to try equitable and legal

14

issues.  (Evid. Code, § 320; *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1285.)  Because ruling on equitable issues may, as happened here, dispose of issues that, depending on the ruling, the jury will no longer need to consider, the court may decide those equitable issues first.  (*Raedeke v. Gibraltar Savings & Loan Assoc.* (1974) 10 Cal.3d 665, 671; *A-C Co. v. Security Pacific Nat. Bank* (1985) 173 Cal.App.3d 462, 473.)  When a "case involves both legal and equitable issues the court may in its discretion decide the equitable issues first.  If the decision as to the equitable issues is such as is determinative of the legal issues a jury trial as to the latter is obviated.  If not, the jury trial as to the remaining issues will follow." (*Jaffe v. Albertson Co.* (1966) 243 Cal.App.2d 592, 609.)

Stanton also contends the court erred in its declaratory judgment because declaratory relief is available only prospectively before a party breaches a contract. Stanton argues declaratory relief is not available to adjust past wrongs or to declare rights or remedies for past harms.  (See, e.g., *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1404 ["Because declaratory relief operates prospectively only, rather than to redress past wrongs, Gafcon's remedy as against Ponsor lies in pursuit of a fully matured cause of action for money . . . ."].)  Stanton's contention overlooks, however, that the statute governing declaratory relief permits a declaratory action when parties have an ongoing "actual controversy" involving their rights and duties as to, among other things, a contract or property in conjunction with seeking other types of relief.  (Code Civ. Proc., § 1060.)

Stanton also contends that the court's ruling finding the retainer agreement void conflicted with the jury's findings.  Stanton reasons that the jury's verdict that he had breached his fiduciary duties toward Don necessarily meant the jury concluded the retainer agreement had created a lawyer-client relationship between him and Don, or else no fiduciary duty would exist to be breached.  According to Stanton, the jury's finding of a valid retainer agreement barred the court from finding differently.  In support, Stanton cites *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, for the proposition that the first fact finder – which Stanton claims was the jury – binds later fact finders, such as, according to

15

Stanton, the trial judge here. As *Hoopes* explained, "The order of trial, in mixed actions with equitable and legal issues, has great significance because the first fact finder may bind the second when determining factual issues common to the equitable and legal issues. [Citations.] It is well established in California jurisprudence that '[t]he court may decide the equitable issues first, and this decision may result in factual and legal findings that effectively dispose of the legal claims.' [Citation.]" (*Id.* at pp. 156-157.) But Stanton's reliance on *Hoopes* rests on his mistaken premise that the jury reached its verdict before the court ruled on Don's motion. In fact, the court ruled the retainer agreement was void before trial counsel had made their closing arguments and the case was submitted to the jury. Thus, the jury was not the first fact finder, and therefore its findings concerning facts common to the causes of action it considered and the court's declaratory relief judgment did not bind the court.

3.     *Severance of Provisions Restricting Right to Terminate and Settle*

Stanton contends the court went too far by refusing to enforce the retainer agreement and in ordering him to disgorge the fees Don paid to him. According to Stanton, even if the court were correct that the retainer agreement unlawfully restricted Don's right to terminate Stanton and settle his litigation with Dan, the proper remedy was to sever those provisions from the retainer agreement and enforce the agreement's remaining provisions. And according to Stanton, severance was especially appropriate because he did not try to enforce the two provisions involving termination of his services and settlement of the litigation because they never came into play. We agree that because Stanton did not try to enforce the termination and settlement provisions, the court erred in ordering disgorgement.

Stanton cites decisions such as *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 990-991, in support of severance. In that case, an actress's personal manager did not have a mandatory talent-agent license when the manager procured a contract for the actress to work on a television show. (*Id.* at p. 981.) When the manager sued the actress for a percentage of her earnings from the show as promised under their

16

management contract, the trial court voided the management contract as an illegal contract for unlicensed talent agency services. (*Id.* at p. 982.) On review, the Supreme Court reversed the trial court's voiding of the entire contract. The Supreme Court remanded the matter to the trial court to consider whether severability allowed the contract's partial enforcement to the extent legal provisions promoting lawful ends remained in the contract. (*Id.* at pp. 990-991; see also *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 [applied severability to attorney fee agreement where illegal provision was New York lawyer trying to collect fees in California, which was unauthorized practice of law, but otherwise permitting compensation for lawful services outside of California]; *Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1523-1525 [applied severability to illegal charging lien provision in contingent fee agreement].)

Severability exists to avoid the hardship of forfeiture for the party seeking to enforce a partially illegal contract, and to avoid an undeserved windfall for the party seeking to void the contract. "Two reasons for severing or restricting illegal terms rather than voiding the entire contract appear implicit in case law. The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement — particularly when there has been full or partial performance of the contract." (*Armendariz v. Foundation Health Psychcare Servs.* (2000) 24 Cal.4th 83, 123-124; accord *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 617 [representing new client adverse to former client is example of the sort of egregiousness needed to disgorge fees; disgorgement of attorneys fees where attorney who had received confidential information accepted employment adverse to former client].)

Here, Stanton points to what he asserts was his extensive work successfully representing Don, and for which Don paid him without complaint until Don discharged him. Stanton claims he provided a number of valuable legal services, including representing Don at the September 2000 mediation against Dan and the February 2001 mediation against Ken; filing a petition to probate Art's estate; and preparing estate tax returns, including "pro forma" returns prepared to analyze various tax strategies and

hypotheticals. Bolstering Stanton's claim, Don's complaint alleged Don retained Stanton on a wide range of legal issues. The complaint alleged: "[Don] retained [Stanton] to represent him in connection with certain matters relative to the case of his mother, Joan Fleischman, including, without limitation, issues involved in the removal of [Don's] brother, Dan Fleischman, from control over their mother's person and estate; disputes with Dan Fleischman arising out of numerous legal actions and proceedings initiated by Dan's conduct, including a lawsuit against [Don], his half-brother (Ken Kaplan), his father (now deceased) the conservators of their mother's estate and others."

Among the services Stanton claims he provided to Don, the most important in Stanton's mind appears to have been his representing Don in the mediations, a point Stanton emphasized in examining Don at trial. As to the September mediation, Stanton established from Don's testimony that "Q. You were represented by Mr. Stanton at this [September 2000] mediation? [¶] A. He was the only one there that was representing me; that's correct. [¶] Q. And he was there because you wanted him to be there; correct? [¶] A. . . . I can't answer that yes or no. [¶] Q. Did he just show up? [¶] A. No. [¶] Q. You didn't tell him not to go, did you? [¶] A. No, I did not. [¶] Q. And once you got there, you didn't tell him to leave, did you? [¶] A. No, I didn't. [¶] Q. And this was a mediation that started about 10:00 o'clock in the morning and ended the next day around 1:00 o'clock in the morning; right. [¶] A. That's correct. [¶] Q. So you and Mr. Stanton were together for about 13 hours. [¶] A. I was there until about I believe 9:00 or 10:00 p.m. [¶] Q. And all during that time, Mr. Stanton was working on negotiations with the other lawyers to resolve the issues with Dan? . . . [¶] A. . . . I believe he was. [¶] Q. He was working on your behalf. . . . [¶] A. I believed that he was." And according to Stanton, the benefits of his legal work in getting Dan to disinherit himself at the September mediation flowed into the February mediation, where Ken sold his interest in Joan's estate to Don. Don testified: "Q. Isn't it a fact that the only reason that Dan Fleischman was not able to seek an inheritance right when your mother died was because by [the] terms of the mediation agreement of September 2000, he gave up his rights to inherit from your mother; correct? [¶] A. That's how it

happened. I don't think that's the only way it could have happened. [¶] Q. That's the way it happened, sir? [¶] A. That's correct. [¶] Q. And you were being represented by Mr. Stanton during the September 2000 mediation? [¶] A. I was being represented by him and only him because of the conversation that we had, yes. [¶] Q. And did you tell Mr. Stanton, Mr. Stanton after the mediation of September 2000, Mr. Stanton continued to represent you? [¶] A. I believe that he did. [¶] Q. And he represented you all the way to the so-called Ken mediation of February 2001? [¶] A. Yes."

The evidence Stanton cites to support his claim that the trial court should have severed the portions of the retainer agreement that it found unlawful and enforced the rest creates a conflict in the record involving disputed issues of fact. For example, although Stanton appeared at both mediations, there was testimony that his role in the February mediation involving Ken was limited to drafting language for an agreement brokered by others. As for Stanton's filing a probate proceeding for Art's estate, there was evidence probate was unnecessary because most of Art's property was in trust, and the probate proceeding was a self-inflicted wound that served only to inflame Dan into filing his $100 million creditors claim against Art's estate at great expense to the estate.

But even if one views the evidence in the light most favorable to Don, we conclude the trial court abused its discretion in ordering Stanton to disgorge all fees that he received. "We review the trial court's determination as to the existence of an actual or potential conflict and whether such conflicts are sufficiently egregious to require forfeiture of fees for abuse of discretion." (*Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 278.) Before a court may order forfeiture, the court must find that the penalty is not too harsh for the offense. (*Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 151.) In support of the court's disgorgement order requiring Stanton to forfeit all fees he received from Don, Don relies on the notion that legal services rendered in violation of professional ethics are deemed to have no value. (*Day v. Rosenthal* (1985) 170 Cal.App.3d 1125, 1162.) But that notion, which is a legal fiction in its "deeming" such services to have no value regardless of the reality of whether the client benefitted from the attorney's services, finds little support in the record here for at

least two reasons involving at least a portion of those fees. First, in finding Stanton did not negligently perform his services, the jury found Stanton performed competently in representing Don; competent legal services have some value greater than zero. Second, the most reliable evidence of the value of Stanton's legal work for Don are the fees that Don paid to him without complaint until their dispute erupted – which amounted to $113,000. The trial court correctly found Stanton could not rely on the unlawful provisions of his retainer agreement to collect a contingency fee from Don's multi-million dollar recovery, but that does not mean Stanton wrongly received the hourly fees that Don paid him. Because Stanton did not try to enforce the unlawful provisions, they were of no consequence in the hourly fees Stanton collected and therefore did not taint those hourly fees. (*Jeffry v. Pounds* (1977) 67 Cal.App.3d 6, 9, 12 [fees recoverable until ethical conflict arises between attorney and client].) Consequently, the trial court's order compelling Stanton to disgorge those fees was unwarranted. (*Armendariz v. Foundation Health Psychcare Servs., supra,* 24 Cal.4th at pp. 123-124 [party who performed under contract should not suffer for having performed, and party who benefitted from the other's performance should not enjoy an undeserved windfall].) Accordingly, we will modify the trial court's disgorgement order to permit Stanton to keep at least the $113,000 in hourly fees that he received from Don.

Don cites *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, for the proposition that an attorney may not collect fees for "services are rendered in contradiction to the requirements of professional responsibility." (*Id.* at p. 618.) That proposition does not apply here because Stanton's services did not violate his professional responsibilities in rendering those legal services for which Don compensated him $113,000 in hourly fees. Stanton's breach of professional responsibilities rested on his including two unlawful provisions in his retainer agreement, but he did not try to enforce those provisions. The difference between Stanton's conduct and the unprofessional conduct in *Goldstein* which Don cites is illuminating. In *Goldstein*, the attorney represented a new client who was adverse to a former client from whom the attorney had received confidential information. (*Id.* at p. 617.) The court found the attorney's conduct sufficiently egregious to warrant

20

disgorging fees because the essence of the violation – representing adverse clients – went to the very core of the representation. (See *Huskinson & Brown v. Wolf, supra,* 32 Cal.4th at p. 463 [noting fees denied in *Goldstein* because attorney sought compensation from a attorney-client relationship that professional rules prohibited].) Here, in contrast, the essence of Stanton's representation of Don was proper – only his efforts to ensure his payment of his contingency fee were wrongful. (See *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1161 [drawing distinction between attorney-client relationship where essence of representation is unlawful versus relationship in which unlawful conduct exists].)

As for that portion of the disgorgement order directing Stanton to return the $287,755 in fees recovered from Joan's Massachusetts Mutual life insurance policy, procedural irregularities involving the court's disgorgement order require us to reverse and remand the matter to the trial court. In November 2008, the jury rendered its verdict in which it found Stanton had breached his fiduciary duty to Don but Don had not been harmed. The jury also found Stanton had not been negligent in representing Don. Two months later in January 2009, Don moved for entry of judgment and for attorney's fees as the prevailing party. The caption on Don's moving papers did not refer to disgorgement, and the "Conclusion" section of his supporting memorandum of points and authorities did not pray for disgorgement. Nevertheless, and despite the jury's verdict awarding no damages to Don, the court ordered Stanton to disgorge all fees that he received, leaving him without a penny for his efforts on Don's behalf. We have already concluded Stanton is entitled to keep the hourly fees he collected. But the postverdict procedural history thwarts our ability to determine the propriety of the rest of the court's disgorgement order, given that it followed a motion that did not style itself as one for disgorgement. Accordingly, we will remand this matter to the trial court for it to determine, in the first instance, the amount, if any, of nonhourly fees Stanton must disgorge to Don.

4. *Don Not Estopped From Challenging Retainer Agreement*

The settlement agreement between Ken and Don resulting from the February 2001

21

mediation ostensibly promised Stanton $430,000 in fees. After the mediation, Don claimed Stanton was not entitled to those fees because Stanton was not a party to the mediation and therefore had no standing to seek fees from that proceeding. In response, Stanton sought his fees from the probate of Joan's estate. In the probate proceeding, Don resisted Stanton's attempt to recover his fees, but argued as a fallback position that, if the probate court awarded Stanton fees, the probate court should apply the retainer agreement's appraisal provision to calculate the amount of those fees. Don argued: "The Retainer Agreement specifically provides for the procedure to follow if there is a fee dispute: . . . [¶] Paul Stanton drafted the Retainer Agreement. He should be bound by that agreement which is directly between him and his former client. Since the parties agreed through the Retainer Agreement on the procedure for the resolution of any fee dispute, Don Fleischman respectfully requests that the Court order that the Retainer Agreement be enforced and the procedures specified therein to resolve fee disputes be followed." The probate court did not, however, resort to Don's fallback position that the retainer agreement's appraisal provision should bind Stanton because the probate court accepted Don's contention that the February mediation agreement did not entitle Stanton to fees. In an unpublished decision, our colleagues in Division 4 affirmed the probate court. (*Stanton v. Fleischman, supra,* (B158265) slip opn. at p. 3.)

In the later trial court proceedings here, the court ordered Don to participate in an appraisal of the commercial and residential properties in Joan's and Art's estates.[6] In ordering the appraisal, the court relied on the retainer agreement which provided for an appraisal if Don and Stanton could not agree on the value of Don's recovery from Dan. The appraisal provision stated: "Since any settlement [between Don and Dan] will most likely be partially non-cash, we [i.e. Stanton and his law firm] are still entitled to be paid our fee based on the value of the total recovery. If we are unable to agree regarding the value of the non-cash assets (if any) received by virtue of any settlement or other

---

[6]    A previous judge in this case (Hon. Alexander Williams), who later recused himself, had denied in a 2005 motion to compel appraisals, but his denial was vacated upon his recusal.

recovery, we agree to have the value of such non-cash assets determined by an appraiser mutually selected by us (or if we cannot agree on an appraiser, upon an appraiser selected by two appraisers, one of which would be selected by you and the other which would be selected by us). We agree in any event to be bound by the valuation of such appraiser." Finding that Don was estopped from arguing the appraisal clause was illegal, the court appointed an appraiser in May 2007. The court thereafter confirmed the appraised values as arbitration awards.

Stanton argues based on the foregoing events that Don should be estopped from challenging the retainer agreement because Don had urged enforcement of the retainer agreement in the probate court. Stanton reads too much into the record. Don only urged enforcement in the probate court of the retainer agreement's *appraisal provision*, and did so as a fallback position if the probate court accepted Stanton's claim for fees. Don did not address the retainer agreement's enforceability as a whole. Indeed, after the trial court ordered Don to participate in the appraisal of the properties in Joan's and Art's estates, Don moved for clarification of the court's order. The court denied Don's motion for clarification because it deemed it a thinly-disguised improper motion for reconsideration. In finding that Don was judicially estopped from challenging the *appraisal provision*, the court expressly stated it had not ruled on the retainer agreement as a whole. The court stated: "I will offer this for anybody's guidance. My ruling was intended only to deal with the provision of the agreement that called for the appraisal of the various properties in order to[,] if the agreement was otherwise enforceable, implement the manner of calculating the fee."

We review the facts supporting a trial court's application of estoppel for substantial evidence, and independently review questions of law involving its application. Applying those standards of review, we review the court's decision whether to apply estoppel for abuse of discretion. "The determination of whether judicial estoppel can apply to the facts is a question of law reviewed de novo, i.e., independently, but the findings of fact upon which the application of judicial estoppel is based are reviewed under the substantial evidence standard of review. . . . [¶] Even if the necessary elements

23

of judicial estoppel are found, because judicial estoppel is an equitable doctrine [citation], whether it should be applied is a matter within the discretion of the trial court. [Citations.] The exercise of discretion for an equitable determination is reviewed under an abuse of discretion standard." (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 46-47.) Here, the probate court accepted Don's argument only as to the appraisal provision. Judicial estoppel reaches only those arguments that a court accepts. (*The Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 835; *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.) Hence, the trial court did not abuse its discretion in finding Don was not judicially estopped from challenging provisions of the retainer agreement other than the appraisal provision, such as the termination and settlement provisions.

5.      *Attorneys' Fees to Don*

After the trial, Don moved for his attorneys' fees. He argued he was entitled to them as the prevailing party under the retainer agreement's provision for attorneys' fees. (Civ. Code, § 1717 [makes attorneys' fees reciprocal in action on contract when contract awards fees to only one party].) The trial court found that Don was the prevailing party under his complaint because, among other reasons, the court's declaratory relief and disgorgement order requiring Stanton to return his fees gave Don a net monetary recovery, and Stanton was awarded nothing against Don. (Code Civ. Proc., § 1032, subd. (a)(4).) The court also found that as for Stanton's cross-complaint for breach of the retainer agreement, Don again was the prevailing party because Stanton recovered nothing.

Don filed a memorandum of costs requesting $688,624 in attorneys' fees and costs. Stanton moved to tax as unreasonable the amount Don sought. The court thereafter awarded Don $688,624. Stanton's challenge on appeal to the award of attorneys' fees and costs boils down to the assertion that because Don sued Stanton for malpractice and breach of fiduciary duty, but the jury awarded Don no damages, Don cannot be the prevailing party. But the trial court concluded otherwise, finding Don was

24

the prevailing party.  Our partial reversal of the court's disgorgement order changes the factual underpinnings of the court's fee and cost award because we have, as an initial matter in ordering remand to reconsider the amount, if any, of disgorgement, reduced by more than two-thirds Don's net monetary recovery on which he rested his claim of being the prevailing party.  Accordingly, in conjunction with the remand to the trial court to determine whether Stanton must disgorge any fees, we additionally direct the trial court to determine in the first instance whether there is a prevailing party, and if so, whether fees and costs should be awarded, and if so, the proper amount of any such fees and costs.

## CROSS-APPEAL

Don filed a protective cross-appeal in the event we reversed the judgment in his favor.  Because we have partly reversed the judgment, we address the contentions that Don raises in his cross-appeal.

### 1.    *Valuation Date of Real Estate*

To calculate the 20 percent contingency fee that Stanton sought from Don's recovery of Art's and Joan's estates against Dan and Ken, the court accepted Stanton's assertion that the property appraiser should assess the value of the recovered real estate as close as practical to the time of trial in 2008.  Don contends that the court erred and that the appraiser should instead have assessed the properties' values as of 2001, when Stanton claims he was entitled to collect his contingency fee.  Because our partial reversal of the trial court's judgment does not upset the trial court's ruling that Stanton was not entitled to collect any contingency fee at all, Don's concern about the properties' valuation date is moot.

### 2.    *Jury Instructions on Fiduciary Duty*

Don claimed a cause of action against Stanton for breach of fiduciary duty.  The jury found Stanton breached his duty, but that the breach caused Don no damage.  The

25

court's principal instructions to the jury on breach of fiduciary duty included the following instructions:

● "Don Fleischman also seeks to recover damages based upon a claim of breach of fiduciary duty. The essential elements of this claim are: [¶] 1. A fiduciary relationship existed between Don Fleischman and Paul Stanton; [¶] 2. Paul Stanton possessed information material to Don Fleischman's interest; [¶] 3. Paul Stanton knew or should have known that this information was material to Don Fleischman's interest; [¶] 4. Paul Stanton failed to disclose this material information to Don Fleischman; and [¶] 5. This nondisclosure caused Don Fleischman to suffer injury, damage, loss or harm. [¶] A fiduciary relationship exists whenever under the circumstances trust and confidence reasonably may be and is reposed by one person in the integrity and fidelity of another. [¶] There was a fiduciary relationship between Don Fleischman and Paul Stanton. [¶] A fiduciary's duty requires the highest good faith and undivided service and loyalty. [¶] A fiduciary has a duty to make full disclosure and communicate to the person with whom he has a fiduciary relationship, all information that is material to that person's interest."

● "A fiduciary must tell his principal of all information he possesses that is material to the principal's interests."

The court refused, however, to instruct the jury with a number of additional instructions that Don offered on fiduciary duty. We conclude the court's refusal was not error because the court's other jury instructions covered most of the same points of law stated in Don's instructions. (*Williams v. Carl Karcher Enterprises, Inc.* (1986) 182 Cal.App.3d 479, 487 overruled on other grounds by *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 ["not error to refuse instructions which are repetitious in substance and would serve only to emphasize unduly a party's theory of the case"].) But

26

even if the court's instructions did not cover every point of law that Don advanced, the court's refusal to give Don's additional instructions did not prejudice Don.

For example, Don contends the court erred by refusing to instruct the jury with Don's special instruction based on CACI 4106 that Stanton breached his fiduciary duty by representing clients with conflicting interests. We find the court did not err, however, because the court instructed the jury that an attorney must not represent adverse clients except under certain conditions, including disclosure to each client and each client's written consent. Citing Professional Rules of Conduct, rule 3-310, the court instructed the jury: "Rule 3-310, titled 'Avoiding the Representation of Adverse Interests' states: A member shall not, without the informed written consent of each client: Accept representation of more than one client in a matter in which the interests of the clients potentially conflict." The court's instruction with Rule 3-310 was sufficient because it covered the same points as Don's special instruction. The "duty of the court is fully discharged if the instructions given by the court embrace all the points of the law arising in the case. [¶] A party is not entitled to have the jury instructed in any particular phraseology and may not complain on the ground that his requested instructions are refused if the court correctly gives the substance of the law applicable to the case." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335.)

Don also contends the court erred in not submitting Don's Special Instruction No. 3 to the jury, which stated Stanton's fiduciary obligation included offering a fee agreement and billings that were "fair, reasonable, and fully explained to the client." We conclude the court did not err, however, because the court instructed the jury with the requirements of Business and Professions Code sections 6147 and 6148, which informed the jury that an attorney must give a client a written fee agreement complying with those statutes' requirements that the agreement fully explain the fees.

Don also contends the court erred in not submitting to the jury Don's Special Instructions Nos. 5 and 6, which stated the contingency fee agreement and February mediation agreement were invalid if they gave Stanton a pecuniary interest in Don's property unless Stanton disclosed his interest and Don waived the conflict. We find the

27

court did not err, however, because it instructed the jury with Rule 3-300. The court told the jury: "Rule 3-300, titled 'Avoiding Interests Adverse to a Client' states: A member shall not enter into a business transaction with a client, or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied: [¶] (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and [¶] (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice; and [¶] (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

Don also contends the court erred in not submitting to the jury Don's Special Instructions Nos. 9 and 10 which stated Stanton could not charge or sue Don for fees for Stanton's services to Art's probate estate unless the probate court approved Stanton's fees. We find the court did not err, however, because it instructed the jury with Probate Code sections 10800 and 10811 governing lawful probate fees, and Probate Section 10813 prohibiting an attorney from charging more than the Probate Code's statutory fees.

Finally, Don does not show for any of the refused instructions that their omission sufficiently prejudiced him to warrant a retrial, even when we view those instructions in the light most favorable to Don. (*Alcala v. Vazmar Corp.* (2008) 167 Cal.App.4th 747, 754.) Don contends, for example, that the court erred in refusing his Special Instruction No. 1 that stated a breach of fiduciary duty need not be intentional and need not harbor an intent to deceive in order to be actionable. We note, however, that the jury found Stanton breached his fiduciary duty, making Special Instruction No. 1 superfluous. Finally, because Don's omitted instructions covered Stanton's duties, and did not instruct on calculating damages, Don does not show how the omitted instructions would have changed the jury's calculation that Stanton's breach of fiduciary duty did not damage Don.

28

## DISPOSITION

Those portions of the judgment ordering Paul Stanton (1) to disgorge $400,755 in attorneys' fees received from Don Fleischman and (2) to pay Don Fleischman interest on the judgment and his attorneys' fees and costs, are reversed. The matter is remanded to the trial court to (1) determine the amount, if any, of nonhourly attorneys' fees Stanton must disgorge to Fleischman; (2) recalculate interest on the judgment, if any, and, (3) redetermine whether there is a prevailing party, and if so, whether any fees or costs should be awarded, and if so, the proper amount of fees and costs, if any, should be awarded. In all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.


                                                            RUBIN, J.
WE CONCUR:


        BIGELOW, P. J.


        GRIMES, J.